IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| TONY LOPEZ, | | |
| | Plaintiff, | |
| | | Case No. 1:19-cv-00126-RAH-JTA |
| v. | | |
| CHAD HAMMACK, | | |
| | Defendant. | |

## MEMORANDUM OPINION AND ORDER

## I.    INTRODUCTION

Honored with the sobriquet of "man's [and woman's] best friend" since the days of Frederick the Great, a dog can be docile or aggressive, affectionate or distant, a dangerous tool or a jolly companion, prone to the same diversity of personalities as their human compatriots. A homophone of the word "canine," itself a shortened version of this domesticate species' Latin classification, the terms "K-9" and "K9" technically comprehend any kind of dog but are more commonly used to refer to those canines trained and utilized by many of this world's police forces. Over the centuries, law enforcement has shown a distinct preference for German Shepherds, Retrievers, Belgian Malinois and bloodhounds.

This "unfortunate case," (Doc. 35 at 1), arose when one such canine, its breed, size, and even name still unknown, latched onto the arm of an innocent bystander who, in the midst of an active police search along Dothan's Hedstrom Drive, decided

to approach, stop and stand within a few dozen of feet of the prostrate form of a previously fleeing criminal suspect. The frenzied peregrinations of at least two suspects preceded this unlucky paroxysm, as did the equally frantic hunt by deputies from the Houston County Sheriff's Department. On the basis of this event, Tony Lopez (Lopez or Plaintiff), the bitten "innocent bystander," (Doc. 30 ¶ 30), launched the instant suit with a Complaint filed on February 15, 2019 (Original Complaint), (Doc. 1), subsequently superseded by the First Amended Complaint (Amended Complaint), filed on January 6, 2020, (Doc. 30). Having culled his defendant list with his Amended Complaint, Lopez now solely names as a defendant, Chad Hammack (Hammack or Defendant), the deputy in charge of the dog who bit him. Hammock has targeted the Amended Complaint with his Motion for Partial Dismissal of Plaintiff's First Amended Complaint (Motion), (Doc. 34), pursuant to Rule 12 of the Federal Rules of Civil Procedure.[1]

Bound to employ the plausibility standard of review established by Rule 12, for the reasons more fully explained below, this Court grants Hammack's Motion. Thus, Count I is dismissed in full and Count II is dismissed, in part, to the extent it is based on Hammack's original decision to release his canine companion. Whether

---

[1] In this Order, any reference to "Rule []" or "Rules" is to one or more of the Federal Rules of Civil Procedure.

Hammack's later actions ran afoul of the Fourth and Fourteenth Amendments will remain the sole issue for further adjudication.

## II.  FACTUAL AND PROCEDURAL BACKGROUND[2]

### A.  Parties' Histories

Based on the record, Hammack and Lopez had never met before March 2, 2018, dawned. A resident of Houston County, Alabama, Hammack was then employed by the Houston County Sheriff's Department as "a law enforcement officer and as a canine handler." (Doc. 30 ¶ 3; *see also* Doc. 1 ¶¶ 3–5, 13; Doc. 18 ¶ 3.) He was thus responsible for a dog whose every detail remains obscure more than one year after Lopez filed the Original Complaint. (*See* Doc. 30 ¶ 25 ("The vast majority of dogs used by police for suspect apprehension are German Shepherds and Belgian Malinoises."); *see also id.* ¶¶ 27–29.) Approximately fifty-years old, Lopez resided on Hedstrom Drive, Dothan, Alabama, and managed several Newk's restaurants. (*Id.* ¶¶ 37–38.)

### B.  Factual Allegations

On March 2, 2018, sirens' unnatural screech pierced the air in Dothan, Alabama, as deputies and officers from two or more law enforcement agencies

---

[2] For purposes of Rule 12, this Court treats the Amended Complaint's allegations as true, though they may, in fact, be more fictional than accurate. *See, e.g.*, *Lawrence v. Dunbar*, 919 F.2d 1525, 1529 (11th Cir. 1990).

initiated a high-speed chase of one or more apparent criminal suspects' fleeing car.[3]
(Doc. 30 ¶¶ 7–8; *see also* Doc. 1 ¶¶ 9–11; Doc. 18 ¶ 1.) This coterie of pursuing
officers included Hammack, a police-canine handler, joined by his usual four-legged
companion. (Doc. 30 ¶ 10; *see also* Doc. 18 ¶ 3.) While the pursuit began outside of
Dothan's city limits, it quickly wound its way within its border. (Doc. 30 ¶ 8; *see
also* Doc. 1 ¶¶ 9–11; Doc. 18 ¶ 1.) This race of hurtling metal only ended when the
suspects' vehicle collided with an unsuspecting driver's own somewhere along
Hedstrom Drive. (Doc. 30 ¶ 8; *see also* Doc. 1 ¶¶ 9–11; Doc. 18 ¶ 1.) Somehow, one
or more suspects jumped from the wreckage and bolted by foot into the darkness.
(Doc. 30 ¶ 8; *see also* Doc. 1 ¶ 12; Doc. 18 ¶ 2.)

What happened after Hammack parked his vehicle at the scene of the collision
prompted this lawsuit. (Doc. 30 ¶ 8; *see also* Doc. 1 ¶ 12; Doc. 18 ¶ 4.) Upon exiting
his vehicle, Hammack apparently "permitted" his dog "to roam free around the
residential area without restraint." (Doc. 18 ¶ 5; *see also* Doc. 30 ¶¶ 12–13.) As
Lopez contends, "[t]he dog was out of sight of the handler." (Doc. 30 ¶ 13; *see also*
Doc. 1 ¶¶ 15–16.) By implication, then, "[t]he K-9 was intentionally released to
attack and seize" even though "[t]he dog could not identify the correct suspect."
(Doc. 30 ¶ 13; *see also* Doc. 1 ¶¶ 15–16.)

---

[3] Within the parties' papers, the number of suspects seems to fluctuate from two to three and back.

For Lopez, all K-9 dogs pose a latent menace. As the Amended Complaint waxes, especially in such situations, "K-9 law enforcement dogs pose a real danger to innocent bystanders and others when ordered to apprehend a suspect" due to their "inherently dangerous nature" and lack of "the necessary mental and cognitive abilities" to distinguish "a suspect from an innocent bystander." (Doc. 30 ¶ 24.) After all, such dogs, "[t]he vast majority of . . . [whom] are German Shepherds and Belgian Malinoises," are "derived from lineages bred for protection and heightened aggressive reactivity." (*Id.* ¶ 25.)

On March 2, 2018, Hammack thus did the opposite of what good sense compelled: "The dog should have never been off his leash . . . and the leash should have been held by the handler and the dog should have only been used when a positive identity had been made on the suspects and without excessive force." (*Id.* ¶ 24.) For all this disquisition, however, Lopez does not ever allege that the *specific* dog that actually bit him, the precise canine for which Hammack was responsible, fit his criteria for, in his dark account, a typical and thus inherently dangerous K-9 dog: "German Shepherd" or "Belgian Malinoises," "bred for protection and heightened aggressive reactivity," purposely selected for his or her "faulty temperament[] and unsuitable for use in law enforcement," trained in accordance with the "Schutzhund" method, and cursed with a "high bite rate[]" and "an eagerness to attack anyone it can find (such as an innocent bystander) as a result of

the dog having a short latency to attack and a low threshold for biting." (*Id.* ¶¶ 25, 27–29.) He speaks only in generalities, *i.e.,* "Dogs like this pose an extreme danger to public safety." (*Id.* ¶ 28.)

Unaware of the dog's release, at least one person—Lopez himself—focused his eyes upon the melee engulfing Hedstrom Drive. In his words, privy to the resultant "loud commotion" from his driveway, (Doc. 1 ¶ 17; *see also* Doc. 18 ¶ 6; Doc. 30 ¶ 14), Lopez nonetheless "decided to see what was going on," (Doc. 30 ¶ 15; *see also* Doc. 1 ¶ 18; Doc. 18 ¶ 6). As he did so, Lopez directly witnessed the crash and noticed the resulting police pursuit. (Doc. 30 ¶ 15; *see also* Doc. 18 ¶ 7.) He soon thereafter observed "an individual lying on the ground in front of one of his neighbors' homes."  (Doc. 30 ¶ 16; *see also* Doc. 1 ¶¶ 19–20; Doc. 18 ¶ 8.) As he approached so as "to render any necessary medical assistance or otherwise help the individual," Lopez "heard an officer speak in his general direction." (Doc. 30 ¶¶ 17–18; *see also* Doc. 1 ¶¶ 19–21; Doc. 18 ¶¶ 8–9.) At that point, approximately forty to sixty feet away from the prone body, Lopez "realized that the individual on the ground must be a criminal suspect." (Doc. 30 ¶ 18; *see also* Doc. 1 ¶ 21; Doc. 18 ¶ 9.) At that very moment, Lopez "stopped immediately" and "raised his hands." (Doc. 30 ¶ 18; *see also* Doc. 1 ¶ 21; Doc. 18 ¶ 9.)

It was then that dog and man met. Suddenly, though Lopez had not fled, the roaming canine "charged from the rear of one of the homes and latched onto Lopez's

arm." (Doc. 30 ¶¶ 19–20; *see also* Doc. 1 ¶¶ 22–23; Doc. 18 ¶¶ 10–11.) For at least

some indeterminate amount of time, Lopez claims, Hammack "did not promptly

recall the dog and stop the attack." (Doc. 30 ¶ 21.) As such, the canine continued to

"maul" Lopez "for several minutes." (*Id.*) According to Lopez, Hammack "thought

. . . Lopez was the suspect," as indicated by the fact that "he had to be told by the

other officers that he was not the suspect." (*Id.* ¶ 23.) Even when he realized "that

it was a case of mistaken identity," however, Hammack "did not stop the attack";

"other officers had to step in and stop it." (*Id.* ¶¶ 22–23.) Tellingly, at least according

to the original Complaint, however, Hammack did command his canine to release

Lopez, but to no avail. (Doc. 1 ¶ 24; Doc. 18 ¶ 12.) For some reason, Lopez's story

changed with the filing of his Amended Complaint.[4]

Though the canine eventually let go, Lopez apparently has suffered a slew of

injuries due to this "horrible attack." (Doc. 30 ¶¶ 47-48.) He claims two surgeries

and over sixty stitches, endures nightmares on a regular basis, and a nerve that will

not heal. (*Id.*) He "now wears a compression glove to help the pain when the two (2)

medications that he has to take three (3) times a day wears off." (*Id.*) Without any

greater specificity, he maintains that his "life and ability to function at his job and

home have been severely affected." (*Id.* ¶ 48.)

## C.   <u>Procedural Background</u>

---

[4] This change, as shown below, is not insignificant.

Lopez first filed suit against Hammack and the Houston County Sheriff's Department. (Doc. 1.) Those named defendants responded with a motion to dismiss and a supporting memorandum. (Docs. 17–18.) After much back-and-forth, this Court permitted Lopez to swap his defective first pleading with the Amended Complaint. (Docs. 22–23, 26–27, 29.) Hammack retorted with an answer, (Doc. 33), and the Motion to Dismiss, both filed on January 21, 2020, (Docs. 34–35). The latter was followed by Lopez's response, (Doc. 37), and Hammack's reply, (Doc. 40).

## III.   <u>RELEVANT STANDARDS</u>

### A.   <u>Rule 12(b)</u>

Rule 12(b) allows for dismissal of a complaint for, among other matters, "failure to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). When confronted with a motion to dismiss presented pursuant to Rule 12(b)(6), a court must construe the complaint in favor of the plaintiff and take all well-pleaded facts as true. *ADA v. Cigna Corp.*, 605 F.3d 1283, 1288–89 (11th Cir. 2010). Nonetheless, "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007); *see also ADA*, 605 F.3d at 1289. "Factual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Stated differently, "the plaintiff must plead

enough facts to state a claim to relief that is plausible on its face," *ADA*, 605 F.3d at 1289 (internal quotation marks omitted).

Plausibility is hence the touchstone of review. A claim can be so classified when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009).   While "[t]he plausibility standard is not akin to a 'probability requirement,'" the Court has further advised: "[I]t asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 556); *see also Moore v. Grady Mem'l Hosp. Corp.*, 834 F.3d 1168, 1171 (11th Cir. 2016) (quoting *Ashcroft*, 556 U.S. at 678). Thus, "[w]here a complaint pleads facts that are merely consistent with a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Ashcroft*, 556 U.S. at 678 (internal quotation marks omitted).

## B.   Section 1983

To state a claim under Section 1983 of Title 42 of the United States Code,[5] a plaintiff must allege (1) that the challenged conduct was "committed by a person acting under color of state law," and (2) that such conduct "deprived [the plaintiff] of rights, privileges, or immunities secured by the Constitution or laws of the United

---

[5] In this Order, any reference to "Section 1983" or "§ 1983" is to this enactment.

States." 42 U.S.C. § 1983.  For conduct to have occurred under "the color of law," a defendant must have acted either (1) with the power of the state behind him or her, or (2) with the apparent power of the state behind him or her. *United States v. Price*, 383 U.S. 787, 794 n.7, 86 S. Ct. 1152, 16 L. Ed. 2d 267 (1966). Crucially, independently of the identity or legal status of the named defendant in a § 1983 case, a plaintiff must always demonstrate that this defendant acted under color of a state "statute, ordinance, regulation, custom, or usage." 42 U.S.C. § 1983.

## IV.   **DISCUSSION**

The Amended Complaint presents two counts, under which Lopez groups a series of somewhat linked causes of action. Count I focuses upon Hammack's "duty to protect the citizens of Houston County" and "to not violate the constitutional rights of Houston County citizens," his breach of these mirrored obligations leading to tort liability under Alabama law. (Doc. 30 ¶¶ 50–53.) In contrast, Count II enumerates claims arising under the Fourth and Fourteenth Amendments of the United States Constitution. (*Id.* ¶¶ 55–63.) For purposes of this count, Lopez makes no distinction between Hammack's initial decision to release his canine—and his purported failure to stop the latter's attack upon confirmation of Lopez's non-suspect status. (*Id.*) As shown below, however, there is a world of difference between these two alleged events, a difference invested with the weightiest of constitutional import.

### A.   **Count I: State Law Claims**

As a matter of unambiguous state law, Lopez's first count against Hammack, a smorgasbord of possible torts unartfully entitled "Negligence, Wantonness, and/or Intentional Conduct Causing Personal injury Against Defendant Hammack," cannot survive even a cursory review under Rule 12.[6]

Fittingly for an amorphous count predicated on state law, it is fundamental Alabama law that necessitates its dismissal. In Alabama, sheriffs are constitutionally established executive officers, ALA. CONST. 1901 art. V, § 112, a constitutional designation that extends to any and all deputy sheriffs. *See Ex parte Sumter Cnty.*, 953 So. 2d 1235, 1239 (Ala. 2006); *Phillips v. Thomas*, 555 So. 2d 81, 83 (Ala. 1989).[7] Consequently, claims against both sheriffs and deputy sheriffs are "barred by the absolute immunity of Article I, § 14, of the Alabama Constitution of 1901," *Coleman v. City of Dothan*, 598 So. 2d 873, 875 (Ala. 1992) (quoting *White v. Birchfield*, 582 So. 2d 1085, 1088 (Ala. 1991)), so long as either deputy or sheriff "act[ed] within the line and scope of their employment," *Ex parte Purvis*, 689 So. 2d 794, 795 (Ala. 1996).

---

[6] Whatever its substantive defects, this Court looks askance at any count that effectively amalgamates different torts, even vaguely demarcated ones, under one penumbra. "Willful and wanton negligence" is not the same as just "simple negligence," and "intentional conduct" is not the same as negligence.

[7] A single reason explains this extension: a "deputy sheriff is the alter ego of the sheriff." *Hereford v. Jefferson Cnty.*, 586 So. 2d 209, 210 (Ala. 1991).

Whatever the wisdom of his particular decisions as a handler on March 2, 2018, Hammack and Lopez's filings agree as to both Hammack's position—a deputy sheriff—and the task in which he was engaged—the pursuit of at least two fleeing criminal suspects—even when his dog pounced on Lopez. (*E.g.*, Doc. 18 ¶¶ 3–5, 12–13; Doc. 30 ¶¶ 2–3, 10–13, 21; Doc. 33 ¶ 2.)  To wit, Hammack, a deputy, released a K-9 dog to "attack and seize" a criminal suspect, in the same—albeit, in Lopez's assessment, dangerous and improper—manner as countless other law enforcement officers in the United States. (Doc. 30 ¶¶ 10, 13, 24–29.)

In point of fact, bereft of details as to the specific dog Hammack used, Lopez tars all police uses of K-9 dogs, thereby inadvertently establishing that Hammack, like other canine handlers, "act[ed] within the line and scope of . . . [his] employment." *Ex parte Purvis*, 689 So. 2d at 795. Not only does no recognizable exception apply, *Parker v. Amerson*, 519 So. 2d 442, 443 (Ala. 1987) (enumerating these carve outs), but Lopez himself concedes that he "does believe and allege that the Defendant was acting at all times material herein as a deputy sheriff and under color of state law," (Doc. 37 at 2). In so conceding, Lopez has vitiated his own first count.

Lopez's attempts to avoid the corollary of this recognition, in turn, does not persuade this Court. He first tries to sidestep the significance of these facts by pointing to his right to amend the Amended Complaint under Rule 15, (Doc. 37 at

1–2),[8] a right he already has once exercised. (Doc. 30.) But neither his desire "not . . . to consent" nor "formal discovery," including "a deposition of the Defendant," (Doc. 37 at 1–2), can save a claim from dismissal when its invalidity inescapably follows from incontrovertible facts and unambiguous law. In such circumstances, his willingness to acknowledge the inescapable is irrelevant, while his insistence on the latter suggests a misconception as to how the Rules' discovery mechanism—and Rule 12—generally operate.

Specifically, one does not possess an absolute right of discovery based on an already jurisdictionally impossible claim, a result utterly inconsistent with the Rules' emphasis on the just and efficient administration of every action, *see* Fed. R. Civ. P. 1, and Rule 12's cynosure, *Rutman Wine Co. v. E. & J. Gallo Winery*, 829 F.2d 729, 738 (9th Cir. 1987) ("The purpose of . . . [Rule] 12(b)(6) is to enable defendants to challenge the legal sufficiency of complaints without subjecting themselves to discovery."). In the incontrovertible absence of a cognizable claim, no right to discovery exists, and no subterfuge can conjecture such an entitlement, at least if Rule 12 possesses any meaning. *See, e.g.*, *Tucker v. Union of Needletrades, Indus., & Textile Emps.*, 407 F.3d 784, 787–88 (6th Cir. 2005) ("'The very purpose of Fed. R. Civ. P. 12(b)(6) is to enable defendants to challenge the legal sufficiency of

---

[8] Perhaps indicating Lopez's confidence in this position, he does not even cite the relevant procedural provision. (Doc. 37 at 1–2.)

complaints without subjecting themselves to discovery.'") (internal quotation marks omitted); *Yuhasz v. Brush Wellman, Inc.*, 341 F.3d 559, 566 (6th Cir. 2003) ("[T]here is no general right to discovery upon filing of the complaint.").

In sum, by virtue of the activity he undertook and the post he held on March 2, 2018, Hammack meets the only two elements needed for absolute (state) immunity under Alabama law, and Lopez's state law claims, the whole gravamen of Count I, must be dismissed.

### B.   Count II: Fourth and Fourteenth Amendment Claim

In contrast to Count I, Lopez's second count against Hammack will remain, but only in part, due to the nature of the statute under and the discrete actions for which he sues. Consisting of Fourth and Fourteenth Amendment claims brought pursuant to § 1983 against Hammack for false arrest, excessive force, and warrantless entry/search, Lopez specifically faults Hammack for three alleged misdeeds: (1) "fail[ing] to issue a proper warning to the Plaintiff to allow him to fully understand he was in danger of being attacked by the police canine"; (2) "allow[ing] the canine unit to attack an individual who was not only innocent bystander, but one that was not fleeing and standing still with his hand up"; and (3) "not promptly stop[ping] the law enforcement dog's attack when they [sic] became aware that the victim was not the suspect." (Doc. 30 ¶¶ 56–57, 59–62.) These decisions "subjected Plaintiff to a substantial risk of serious harm stemming from

their manner" and amount to "excessive force," all effectuated in the absence of "adequate probable cause for . . . Hammack to make a seizure of the Plaintiff." (*Id.* ¶¶ 60–62.)

These paragraphs effectively merge two different events for which discrete constitutional analysis is necessary. As explained below, up until Hammack realized Lopez's innocence and opted not to somehow end his canine's grip, no misdeed of constitutional magnitude has taken place. Thereafter, if Hammack did nothing, a claim for excessive force in violation of the Fourth Amendment would have sufficient constitutional anchor to survive. Because the Court must treat Lopez's latest allegations as true for purposes of Rule 12(b)(6), the portion of his second count grounding Hammack's liability in such alleged inaction must, and therefore does, survive.

### 1.    Excessive Force: Dog's Release and Initial Lunge

As to the portion of this count based on Hammack's original release of his canine into the neighborhood and the initial use of force on Lopez by the dog, but not as to his failure to call off this assault upon his arrival, well-settled law compels its dismissal for two distinct reasons.

First, these acts, considered independently and collectively, cannot constitute a "seizure" for purposes of the Fourth Amendment. In relevant part, the Fourth Amendment states: "[t]he right of the people to be secure in their persons, houses,

papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. CONST. amend. IV. As the United States Supreme Court has held, "all claims that law enforcement officers have used excessive force . . . in the course of an arrest, investigatory stop, or other seizure of a free citizen should be analyzed under the Fourth Amendment and its reasonableness standard." *Graham v. Connor*, 490 U.S. 386, 395, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989) (internal quotation marks omitted). Because the Fourth Amendment requires a "government seizure," *Reyes v. Maschmeier*, 446 F.3d 1199, 1203 (11th Cir. 2006) (citing *Evans v. Hightower*, 117 F.3d 1318, 1320 (11th Cir. 1997)), "[t]he first step in reviewing an excessive force claim is to determine whether the plaintiff was subjected to the intentional acquisition of physical control by a government actor — that is, whether there was a seizure within the meaning of the Fourth Amendment." *Vaughan v. Cox*, 343 F.3d 1323, 1328 (11th Cir. 2003) (internal quotation marks omitted). This standard, courts have repeatedly advised, is purely objective. *See Brower v. Cnty. of Inyo*, 489 U.S. 593, 596, 109 S. Ct. 1378, 103 L. Ed. 2d 628 (1989) (establishing the relevant standard); *see also Ansley v. Heinrich*, 925 F.2d 1339, 1344 (11th Cir. 1991) (holding that negligence, alone, absent any intentional government conduct, cannot form the basis of a claim under § 1983 premised on the Fourth Amendment).

Applying this standard to the present context, the requisite seizure cannot occur in the absence of proof of a police canine handler's "intent" to acquire physical

control of the injured plaintiff, regardless of his or her classification as a "suspect" or "an innocent bystander." *Neal v. Melton*, 453 F. App'x 572, 577 (6th Cir. 2011); *Andrade v. Burlingame*, 847 F. Supp. 760, 764 (N.D. Cal. 1994); *cf. Evans*, 117 F.3d at 1321 ("The unintentional consequences of lawful government action cannot form the basis for a Fourth Amendment violation."). True, that a law enforcement officer may have intended to release the canine, "the means of the seizure," but unless he or she willfully and knowingly directed the dog at another person, the kind of "intentional and knowing contact" required to violate the Fourth Amendment does not exist. *Dunigan v. Noble*, 390 F.3d 486, 492–93 (6th Cir. 2004). Though some factual differences can be adduced, an extensive jurisprudence has coalesced around this particular exegesis of the Fourth Amendment. *See, e.g.*, *Wilson v. Phares*, No. 1:14-cv-276-WKW, 2015 U.S. Dist. LEXIS 41028, at *12–19, 2015 WL 1474627 (M.D. Ala. Mar. 31, 2015) (collecting and dissecting the relevant cases);[9] *cf., e.g.*, *Thomson v. Salt Lake Cnty.*, 584 F.3d 1304, 1315–16 (10th Cir. 2009) (holding that a properly-trained police dog generally does not reach the high degree of force

---

[9] *Wilson* exemplifies this pattern rather perfectly. While the dog there was indeed acting to "a sudden need to protect its handler," as Lopez contends, (Doc. 37 at 4), it is indistinguishable from the present case up to the point in time when Hammack knew of Lopez's innocence.  In other words, Lopez strives mightily to set aside the *Wilson* case—"The *Wilson* case is distinguished from the present case in that the officer did not intend for the dog to seize the person who the dog attacked," (*Id.*)—even though he himself acknowledges Hammack released his canine without the aim of seizing an "innocent bystander." *See supra* Part II.B. His distinction amounts to artless sophistry, for this is precisely what Hammack did at first, at least based on Lopez's own pleaded facts.

necessary to violate the Fourth Amendment); *Miller v. Clark Cnty.*, 340 F.3d 959, 963 (9th Cir. 2003) (same).

Here, as in the foregoing cases, Lopez fails to plausibly demonstrate that Hammack intended to initially seize Lopez up until Hammack appeared on the scene and confirmed Lopez's innocence. Read line by line, the Amended Complaint utterly lacks any assertion that Hammack commanded his dog to specifically bite Lopez with full awareness of Lopez's deliberate, if innocent, and wholly unexpected appearance on a busy scene. Rather, it does the opposite. As Lopez himself recounts, the canine was "intentionally" released for the purpose of locating a fleeing criminal suspect, and he latched onto his arm when Lopez was in the close vicinity of one such prone suspect. (Doc. 30 ¶¶ 12–13, 18; *see also* Doc. 40 at 3–4.) The deputy's dog was "not restrained" and may have been unable to "identify the correct suspect," but while this canine was "intentionally released to attack and seize," he was not unleashed so as to latch onto Lopez's raised arm. (Doc. 30 ¶¶ 12–13.)

As Lopez's account repeats, Hammack "deployed" his dog "to search for and apprehend the *suspect*," and thus not so as to corral a neighbor who left his driveway out of the curiosity that leads many to gawk at accidents.[10] (*Id.* ¶ 32; *see also* Doc. 37 at 3.) That Hammack "intentionally let the dog loose to seize someone, and the

---

[10] Revealingly, Lopez once described Hammack as even "attempt[ing] to issue commands to the canine for him to release the bite." (Doc. 1 ¶ 24.)

dog seized Lopez" is not enough if the intent to seize Lopez was not there for a constitutional violation to arise, as Lopez later flubs, (Doc. 37 at 3–4); in such cases, the law regards the two events, however unfortunate, as distinct, perhaps enough to engender a tort, but never alone sufficient to trigger constitutional sanction.

In short, in the absence of a personalized intent against Lopez rather than just, at worst, an unnamed "someone," one which Lopez does not plead, the law discerns no seizure.

Second, at least as to the dog's release and first bite, Hammack possesses an ace—the defense of qualified immunity—that Lopez misconstrues even if he had, indeed, sought to seize Lopez. While § 1983 fails to mention any defenses in its bare text, *Imbler v. Pachtman*, 424 U.S. 409, 417, 96 S. Ct. 984, 47 L. Ed. 2d 128 (1976), the Court has consistently allowed for some form of immunity to be asserted so long as that "tradition of immunity was so firmly rooted in the common law and was supported by such strong policy reasons that Congress would have specifically so provided had it wished to abolish the doctrine," *Owen v. City of Independence*, 445 U.S. 622, 637, 100 S. Ct. 1398, 63 L. Ed. 2d 673 (1980) (internal quotation marked omitted). In particular, police officers enjoy one such shield, commonly known as qualified immunity. *Pierson v. Ray*, 386 U.S. 547, 556–57, 87 S. Ct. 1213, 18 L. Ed. 2d 288 (1967). As construed by the Court, so long as an official did not violate a

clearly established right of which he should have known, that official enjoys such immunity. *Scheuer v. Rhodes*, 416 U.S. 232, 94 S. Ct. 1683, 40 L. Ed. 2d 90 (1974).

Simply put, Hammack's release of his canine, and the unfortunate bite that followed, cannot be said to violate clearly-established law. Lopez does not cite any binding authority establishing that, under the circumstances Hammack faced, he could be held liable under the Fourth Amendment for excessive force based upon his police dog's spontaneous bite of an individual where, when, and who he did not command the attack. It is Lopez's words that limit this tale: as he says, the unleashed dog "charged without restraint" at his standing shape. (Doc. 30 ¶¶ 18–20.) Pursuant to his own pleadings, no officer was present when the dog first jumped, and his ears had recorded no direction to attack Lopez specifically but rather just "speak[ing] in his general direction." (*See id.*) Though he pleaded otherwise in his first filing before this Court, Lopez later admits as much: only "after the attack" did Hammack "not promptly recall the dog and stop the attack." (*Id.* ¶ 21.) Certainly, no juridical edict brands Hammack's original set of decisions with unconstitutionality's scarlet imprimatur. *See, e.g.*, *Edwards v. Shanley*, 666 F.3d 1289, 1295 (11th Cir. 2012) (holding, based on that case's specific circumstances, that "the force necessarily caused by using a dog to track a fleeing suspect [wa]s reasonably tailored to the risk that a fleeing suspect present[ed]"); *Miller*, 340 F.3d at 965 (use of K9 force was justified against suspect who had fled from police and was hiding in woods);

*Matthews v. Jones*, 35 F.3d 1046, 1051 (6th Cir. 1994) (use of K9 force was reasonable when suspect fled into the dark woods after a traffic stop, making it easier for suspect to ambush the officers); *cf. Cooper v. Brown*, 844 F.3d 517, 523 (5th Cir. 2016) (establishing, at least within the jurisdiction of the United States Court of Appeals for the Fifth Circuit, that when "[n]o reasonable officer could conclude that [a suspect] pose[s] an immediate threat to [law enforcement officers] or others," it is unreasonable to use K9 force to subdue a suspect who is complying with officer instruction); *Thomson*, 584 F.3d at 1316 ("We see no need to deprive police officers of the benefit of these useful tools (i.e., police dogs) solely because they carry the potential to cause serious harm."). After all, the Court has stated qualified immunity should be available to "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341, 106 S. Ct. 1092, 89 L. Ed. 2d 271 (1986).

With strange confidence, Lopez does proffer two inapposite cases that he maintains compel otherwise.  (Doc. 37 at 3–5.) Unfortunately, both suggest no more than that an officer purposely directing a dog to attack a compliant suspect or failing to stop such an assault could run afoul of the Fourth Amendment. *See, e.g.*, *Trammell v. Thomason*, 335 F. App'x 835, 843–44 (11th Cir. 2009);[11] *Priester v. City of*

---

[11] Though this Court regards the fact that this decision is unpublished to be mostly irrelevant to its substantive cogency, this verity does undercut its ability to serve as "clearly established law," *J W*

*Riviera Beach, Fla.*, 208 F.3d 919, 924 (11th Cir. 2000). Neither *Trammell* nor *Priester* recognizes such a wrong's occurrence *until* an officer has actively directed an attack or neglected to restrain his dog upon knowledge of its injustice. *See Moulton v. Prosper*, Case No. 18-61260-CIV-ALTMAN/Hunt, 2019 U.S. Dist. LEXIS 155450, at *24, 2019 WL 4345674 (S.D. Fla. Sept. 12, 2019) ("*Trammel* stand[s] for the proposition that qualified immunity may be inappropriate where there is a genuine dispute about the duration of a police dog's deployment[,]" but is "entirely inapposite to . . . [whether an officer's] initial decision to deploy the dog was reasonable.").

Meanwhile, as noted above, dozens of courts, including the Eleventh Circuit, have glimpsed no constitutional failing in a dog's release and first bite in the midst of an active police search, a view of the Fourth Amendment seemingly advanced by one of Lopez's own cases. *See Trammell*, 335 F. App'x at 843–44 (opining that an arguable violation of a clearly established constitutional norm took place because the officer in question allegedly "permitted his dog to engage in an attack *after* it became apparent that he was not the suspect and posed no apparent danger to the officers") (emphasis added); *see also Priester*, 208 F.3d at 923–24 (finding a Fourth Amendment violation when officers "sadistically released the dog" on a suspect who

---

*v. Birmingham Bd. of Educ.*, 904 F.3d 1248, 1260 n.1 (11th Cir. 2018), as Hammack correctly notes, (Doc. 40 at 5).

had "laid down on the ground" in accordance with police instructions); *Craft v. Genao*, Case No. 6:10-cv-260-Orl-22TBS, 2012 U.S. Dist. LEXIS 197581, at *29–33 (M.D. Fla. Dec. 13, 2012) (concluding that the key factor in cases like *Trammell* is "the *duration* of the attack, not the officer's decision to use the dog in the first place"). To counter this overwhelming majority, Lopez tenders one district court case—*Collins v. Schmidt*, 326 F.Supp.3d 733, 738–42 (D. Minn. 2018)—that cannot be said to establish "clearly established law" in the face of *Priester*, *Trammell*, and more.

Consequently, because the contours of the law are not clearly established so that a reasonable officer in Hammack's position would have known that his actions violated Fourth Amendment seizure law up until he confirmed Lopez's non-suspect status, Hammack is entitled to qualified immunity.

### 2.    Excessive Force: Failure to Recall Dog

As Hammack does not challenge his potential liability for events "after the attack," (Doc. 40 at 2–3), Count II's Fourth and Fourteenth Amendment claim, *i.e., Lopez's* allegations that Hammack permitted the canine to attack him for an extended period of time after realizing he was not the fleeing criminal suspect, merits no discussion.

## V.    <u>CONCLUSION</u>

For the reasons stated above, it is

ORDERED as follows:

(1) To the extent the Defendant seeks dismissal of Count I in full, the Motion for Partial Dismissal of Plaintiff's First Amended Complaint is GRANTED and Count I is dismissed with prejudice. (Doc. 34).

(2) To the extent the Defendant seeks dismissal of the portion of Count II predicated on Hammack's initial release of his canine partner, the Motion for Partial Dismissal of Plaintiff's First Amended Complaint is GRANTED and this part of Count II is dismissed with prejudice.  (Doc. 34.)

All that remains is Plaintiff's claim in Count II under the Fourth and Fourteenth Amendments relating to Hammack's alleged failure to timely call off his canine partner.

DONE, this 6th day of May, 2020.

_____/s/ R. Austin Huffaker, Jr._____
R. AUSTIN HUFFAKER, JR.
UNITED STATES DISTRICT JUDGE